# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| AMERICAN ACHIEVEMENT CORP., TAYLOR PUBLISHING COMPANY, COMMEMORATIVE BRANDS, INC., | Case No. 21-CV-2613 (NEB/BRT) |
| Plaintiffs, | ORDER ON MOTIONS TO DISMISS |
| v. | |
| JOSTENS, INC., | |
| Defendant. | |

In this lawsuit, Balfour[1] alleges that Jostens engaged in a nationwide scheme to steal Balfour's clients and confidential business information, in part by recruiting Balfour's sales representatives. (ECF No. 54 ("Am. Compl.") ¶ 1.) Jostens counterclaims, seeking a declaratory judgment that its recruiting practices are lawful and raising several other claims related to one of its products, class rings. (ECF No. 70 at 23–83 ("Countercl.") ¶¶ 99–190.) Now before the Court is Jostens's motion to dismiss Balfour's complaint on all counts except Count II, (ECF No. 65), and Balfour's motion to dismiss Jostens's counterclaims. (ECF No. 89.) The Court grants in part and denies in part both motions.

---

[1] Plaintiffs Taylor Publishing Company ("Taylor") and Commemorative Brands, Inc. ("CBI"), are separate divisions of Plaintiff American Achievement Corp., which is known as Balfour. (Am. Compl. ¶¶ 24–27.) The Court and the parties refer to Plaintiffs collectively as Balfour and identify individual plaintiffs when relevant.

## BACKGROUND[2]

Balfour and Jostens both produce products for schools, including yearbooks, caps and gowns, and graduation announcements. (Am. Compl. ¶¶ 5, 32, 53; *see also id.*¶ 55 (asserting that Balfour and Jostens are two of the three major competitors in the school products industry).)

Balfour operates through independent contractor sales representatives. (*Id.* ¶ 5.) These representatives develop relationships with clients, sometimes over decades, within a limited-service territory. (*Id.* ¶¶ 5, 7.) Balfour generally experiences minimal turnover, usually retaining 96–98 percent of its clients. (*Id.* ¶¶ 8, 36.)

The school products sales industry is personal, and Balfour's "sales representatives are the lifeblood of the company." (*Id.* ¶ 34.) They make long-term relationships and build goodwill critical to the business. (*Id.* ¶ 37.) Balfour spends money to support these relationships, including by paying for sales representatives' travel expenses and multi-day workshops. (*Id.* ¶ 38.) Sales representatives also have access to Balfour's products and sensitive business information, including client lists and contacts, selling procedures, prospective and current client lists, account information, financial information, and business development plans. (*Id.* ¶ 40.)

---

[2] The Court draws the following background from the operative complaint, accepting as true all factual allegations in the complaint and drawing all reasonable inferences in favor of the nonmovant. *Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014); *Monsanto's Superior Edge, Inc. v. Monsanto Co.*, 44 F. Supp. 3d 890, 893 (D. Minn. 2014) (citing *Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 534 (8th Cir. 2014)).

## I.  Balfour's Claims

### A.  *Representative Agreements*

Balfour enters into Representative Agreements with its sales representatives that include non-competition, non-solicitation, and non-disclosure provisions. (Am. Compl. ¶ 42.) For example, the Representative Agreement of Jim Hawkinson (a Balfour-turned-Jostens sales representative) requires that:

> for a period of two (2) years after the expiration or termination of this Agreement . . . Regional Representative will not, for himself or on behalf of or in conjunction with any other person or entity, directly or indirectly, sell products, solicit sales of products or assist others to sell or solicit sales of products of the kind or character of or similar to Taylor products in the Territory in which he sold Taylor products. . . .

(*Id.* ¶ 45.)

These provisions are common in the industry, and Jostens uses similar agreements. (*Id.* ¶ 53.) Jostens is aware of the non-competition, non-solicitation, and non-disclosure clauses in Balfour's Representative Agreements. (*Id.*) Despite this knowledge, over the last year, Jostens allegedly induced former Balfour sales representatives to move to Jostens and bring client information with them. (*Id.* ¶ 54 (indicating that the Jostens "raid" started in 2021 and continues to today).)

*21 representatives*. During "a short period in the middle of 2021," 21 former Balfour representatives around the country left Balfour for Jostens. (*Id.* ¶¶ 1, 61.) Together, these representatives generated over ten million dollars in sales. (*Id.* ¶ 62.) Jostens offered the representatives "considerable signing bonuses" to leave Balfour and help transfer clients

to Jostens. (*Id.*) Balfour alleges that Jostens presented representatives with a "plan" to take Balfour's business: the outgoing Balfour representatives would tell a school about their intent to resign and encourage the school to transfer its account, and then a Jostens representative would reach out to ask the school if it wanted to hear a pitch. (*Id.* ¶¶ 63, 68.)

Balfour pleads one example of this plan: after Hawkinson left Balfour, a Jostens employee emailed his former clients to state, "Jim is no longer with Balfour" because he "has made the move to Jostens." (*Id.* ¶ 65.) According to Balfour, the Jostens employee and Hawkinson worked together to move former clients to Jostens. (*Id.* ¶¶ 65–66.)

Balfour also asserts that Jostens had former Balfour representatives "flip" territories to transition business. One former Balfour representative would flip territories with another former Balfour representative, and they would provide information to each other. (*Id.* ¶¶ 74–75.) Again, Balfour pleads one example: Hawkinson participated in a flip. He worked with Stacey Sisk, Payton Blewett, and McKinley Witbrodt (Sisk and Blewett are allegedly friends of Hawkinson's, and Witbrodt is his daughter) to have them take over in his former service territory. (*Id.* ¶¶ 77–78.)

Balfour next alleges a scheme in which Jostens encouraged "soft hand-offs," in which "a former Balfour representative would let their former clients know that they were resigning and introduce their former clients to a Jostens employee or sales representative who could 'take over' their account and service them in the same way as

the former Balfour sales representative." (*Id.* ¶ 79.) Balfour alleges no specific instances of soft hand-offs.

Finally, Balfour alleges that Jostens spread false rumors (and encouraged former representatives to do the same) that Balfour would be going out of business and was not a reliable source for future products. (*Id.* ¶ 82.) Balfour pleads no specific details about the alleged rumors: it does not allege who made the statements, who heard the statements, when the statements were made, where the statements were made, or what was said.

*Damages.* In the five months since Balfour sales representatives started leaving for Jostens, Balfour asserts that it lost 1,000 clients, a significant majority of those serviced by former Balfour representatives. (*Id.* ¶ 86.) The full extent of damages from this exodus is not yet known, because some contracts have one-year renewal terms that have not expired yet. (*Id.* ¶ 87.)

**B.    *Trade Secrets***

Balfour alleges trade secret protection for "pricing information, account contact lists, customer information, product information, product lists, supplies bulletins, sales plans, financial information, and commission matrices," sales and marketing techniques and strategies, and compensation and bonus structures. (Am. Compl. ¶¶ 138, 142.) Balfour alleges that it makes reasonable efforts to maintain the secrecy of this information,

5

including through provisions in the Representative Agreements that state that this information is confidential. (*Id.* ¶ 44.)

Balfour also alleges that it receives economic value from this secrecy, given the "personal nature of the school products industry." (*Id.* ¶¶ 35, 139.) Client development is tricky in the school products industry because there is little client turnover, so Balfour expends significant effort into building these relationships and apparently also into documenting those relationships in lists. (*Id.* ¶¶ 36–37, 138, 142–43.)

*Michael Parker.* Michael Parker worked at Balfour for decades, most recently as Vice President of National Sales. (*Id.* ¶ 57.) Just days before Parker resigned from Balfour, he began forwarding confidential information, including lists of Balfour sales representatives and their service territories, to his personal email address. (*Id.* ¶¶ 57–59.) Balfour also alleges that Parker provided client information to Jostens. (*Id.* ¶ 60.)

## II.   Jostens's Counterclaims: Class Rings

*Country of Origin.* Jostens raises several counterclaims against Balfour[3] relating to Balfour's production of class rings. Most of these rings are produced in Mexico, and

---

[3] Balfour objects to the "lumping" of counter-defendants. According to Balfour, only Plaintiff CBI produces class rings. Plaintiff Taylor does not produce class rings, and therefore could not be liable for the claims relating to class rings. And Plaintiff American Achievement Corp. is the parent company to CBI and Taylor, so it could not be directly liable for the allegations about class rings. (ECF No. 91 at 43–44.) The Court takes the point, but Balfour's explanation makes clear that Balfour understands which allegations are against which counter-defendant and that the three counter-defendants will not "be forced to guess which allegations in the complaint were pleaded against it." *Moua v. Jani-King of Minn., Inc.*, 613 F. Supp. 2d 1103, 1111 (D. Minn. 2009) (quotation marks and

Jostens asserts that Balfour has misrepresented that fact. (Countercl. ¶¶ 68, 78, 87.) Balfour puts a removable paper label on its class rings, which states that they are "designed and engineered in Austin, Texas" and "Exclusively Manufactured by Balfour in Merida, Mexico." (*Id.* ¶ 74.) The label also identifies Balfour's Austin, Texas address. (*Id.* ¶ 73.) Jostens alleges that "engineered" means "designed and built using scientific principles," "to design and build something," or "to lay out, construct, or manage as an engineer." (*Id.* ¶ 82.) Thus, according to Jostens, the label on the rings misrepresents the country of origin because the rings were not "engineered"—meaning built or constructed—in Texas. (*Id.* ¶ 84.)

Jostens admits that the rings are designed in the United States and that parts of the rings might be produced in the United States. Jostens takes issue with the fact that domestic "manufacturing is limited to the creation of an unfinished ring product" which is then sent to Mexico to be made into a finished ring. (*Id.* ¶ 85.)

*Bid to Clemson.* Jostens also alleges that Balfour misrepresented the price of its rings to Clemson University. (Countercl. ¶¶ 54, 56.) Balfour and Jostens both bid on the

---

citation omitted). The Court will permit Jostens's pleading against "Balfour" as a group of counter-defendants, because Balfour puts itself out as doing business as one entity. Balfour raised claims against Jostens as a collective, and Balfour has notice of which claims implicate which entities. *See A legendary history*, Balfour, https://www.northtexasyearbooks.com/balfour-publishing (last visited July 19, 2022). To hold each counter-defendant liable, Jostens will have to show how each was involved in alleged tortious conduct, and Balfour is free to defend against these claims by showing that some counter-defendants did not participate in the alleged wrongdoing.

account.[4] (*Id.* ¶ 55.) At first, Clemson awarded the contract to Balfour. (*Id.*) But Balfour's bid did not meet Clemson's mandatory fixed-price commitment, so Jostens protested Clemson's decision. (*Id.*) Clemson started a second bid process. (*Id.* ¶ 56.) In the second process, venders had to submit "firm, fixed pricing" for rings. Both Jostens and Balfour submitted compliant bids. (*Id.*) Clemson again awarded the contract to Balfour. (*Id.* ¶ 58.)

Balfour charged more for the rings than proposed in the bid. (*Id.* ¶¶ 59, 60.) Jostens alleges that Balfour submitted the bid with no intention to charge a "firm, fixed price," thus its bids included material misrepresentations about the price of class rings. (*Id.* ¶¶ 61–64.) This conduct damaged Jostens's business. (*Id.* ¶ 67.)

Jostens also alleges that Balfour misrepresented where its rings were produced to win the bid. In part of the bid, Balfour allegedly certified that its class rings would be made in the United States. (*Id.* ¶¶ 91–92.)

## ANALYSIS

### I.   Legal Standard

*Mootness.* Jostens moved to dismiss the complaint for failure to state a claim under Rule 12(b)(6), but before this Court ruled on the motion, Jostens answered the same complaint. (ECF Nos. 65, 70.) Balfour asserts that Jostens rendered its motion to dismiss

---

[4] As Balfour explains in its motion to dismiss the counterclaims, Palmetto Balfour, a subsidiary of Balfour, won the bid. (ECF No. 92-2.) But as discussed below, Jostens has pled that Balfour participated in the bidding process. The Court accepts Jostens's allegations as true at this stage.

moot by filing the answer. But Jostens's filings follow Rule 12(b) of the Federal Rules of Civil Procedure, which requires that a Rule 12(b) motion be made before any responsive pleading is filed: it made the motion before it answered the complaint. And even if Jostens had filed the motion to dismiss after the answer, the proper procedure would be to treat the motion to dismiss as a motion for judgment on the pleadings under Rule 12(c). *Wescott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). The distinction between a Rule 12(b) motion and a Rule 12(c) motion is "purely formal," because courts review 12(c) motions under the same standard as 12(b)(6) motions. *Id.* Thus, the Court declines to dismiss the complaint for "mootness" and applies the Rule 12(b)(6) standard of review.

*Motion to dismiss.* Under Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) requires that the Court dismiss a complaint for failure to state a claim upon which relief can be granted if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must "tak[e] all facts alleged in the complaint as true, and mak[e] reasonable inferences in favor of the nonmoving party." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014). Although the factual allegations need not be detailed, they "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). The facial plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Thus, where a complaint alleges "facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

## II.    Balfour's Claims

Jostens moves to dismiss several of Balfour's claims: (1) Count 1 for tortious interference with sales representatives' noncompete agreements; (2) Count 3 for alleged violations of the Minnesota Deceptive Trade Practices Act from "defamatory" statements about Balfour's business strength; (3) Count 4 for trade secret misappropriation relating to confidential information about client lists and other business secrets; and (4) Balfour's punitive damages request. As discussed below, the Court grants the motion to dismiss Count 3 but denies the motion as to the other claims.

### A.    *Count I: Tortious Interference with Noncompete Provisions*

Balfour's first claim is for tortious interference with its agreements with 21 former sales representatives. Balfour does not allege details about each of the 21 representatives. Instead, it pleads a pattern supported by specific details about some of them. From that pattern, Balfour asks the Court to infer that Jostens improperly interfered with all of them.

"Minnesota recognizes a claim of tortious interference with employment that extends to at-will employment agreements."[5] *Cenveo Corp. v. S. Graphic Sys., Inc.*, 784 F. Supp. 2d 1130, 1139 (D. Minn. 2011). There is no claim for tortious interference, however, if Jostens "simply made a better offer and the employee terminated the at-will employment" because a "competitor is entitled to compete." *Cenovo Corp.*, 784 F. Supp. 2d at 1140 (cleaned up).[6]

"Under Minnesota law, a claim of tortious interference with contractual relations requires that [Balfour] show: '(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.'" *E-Shops Corp. v. U.S. Bank Nat. Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012) (citing *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc.*, 325 N.W.2d 20, 25 (Minn. 1982)).

---

[5] The parties did not make choice-of-law arguments in their briefing on this motion. At the hearing, both parties stated that they intend to raise choice-of-law arguments on later motions. The Court applies Minnesota law because the parties have done so but makes no judgment about the appropriate choice of law for this action.

[6] Jostens cites *Cenovo Corp.* for the proposition that Minnesota law includes a legal presumption that recruitment is fair competition. The *Cenovo Corp.* court acknowledged that there is no wrongful means used when a prospective employer "simply made a better offer and the employee terminated the at-will employment." 784 F. Supp. 2d at 1140 (citation omitted, cleaned up). But it did not create a legal presumption that recruitment is fair. In fact, in *Kallok v. Medtronic, Inc.*, the Minnesota Supreme Court summarily stated that the third element (intentionally procuring a breach) was met when an employer offered an employee a job where acceptance would be a breach of the employee's noncompete agreement. 573 N.W.2d 356, 362 (Minn. 1998). Minnesota law does not include a specific "presumption" that recruitment is fair competition.

At base, Jostens's argument is that Balfour does not allege these elements with sufficient factual specificity. "Unlike claims for relief based on fraud, there is no requirement that the circumstances giving rise to a claim for inducing breach of contract by a means other than deceit must be stated with particularity." *Strategic Energy Concepts, LLC v. Otoka Energy, LLC*, No. 16-CV-463 (MJD/BRT), 2016 WL 7627040, at *11 (D. Minn. Nov. 18, 2016) (quoting *Royal Realty Co. v. Levin*, 244 Minn. 288, 295 (1955)). In explaining the interaction between Rule 12 and state law, other district courts have noted that a plaintiff like Balfour may lack access to sufficient factual detail to plead a tortious interference with contract claim with substantial specificity. Thus, allegations need not "be highly specific. . . . [I]t is unrealistic to expect Plaintiff to have access to details about alleged behind-the-scenes actions the Defendants took . . ." *Id.* at *11. Balfour has alleged facts with sufficient detail to give notice of the conduct it complains about. And accepting the factual allegations as true, it has pled enough facts to state a plausible claim for relief.

Balfour alleges that Jostens knew that Balfour's representatives were bound by noncompete clauses. Reading the complaint in the light most favorable to Balfour, the Court infers that Jostens created a recruitment program designed to induce Balfour representatives to leave the company and work for Jostens. It then asserts that each representative breached the noncompete agreement while working at Jostens.[7] It is

---

[7] Thus, this case is distinguishable from *Prudential Insurance Co. v. Metrowide Group*, which is cited by Jostens. No. 08-CV-6438 (JMR/SRN), 2009 WL 9110461, at *8 (D. Minn. 2009). In *Prudential*, the court dismissed a claim for tortious interference with contract that did

reasonable to infer, based on the Complaint as a whole, that Jostens designed a recruitment program to improperly induce Balfour representatives to breach their noncompete agreements.

For example, for 15 sales representatives[8], Balfour alleges that each left Balfour to join Jostens and misappropriate, misuse, and exploit "confidential information and trade secrets without justification or consent to subvert Balfour's interests and indirectly and directly solicit." (Am. Compl. ¶ 81.) It also alleges that all 21 former representatives "materially breached the non-competition, non-solicitation, and non-disclosure obligations under his Representative Agreement" by (1) soliciting clients during the Restricted Period, (2) doing business with restricted clients during the restricted period, and (3) misusing Balfour's confidential information. (*Id.* ¶¶ 97–113.) Balfour alleges that Jostens induced this breach by presenting Balfour sales representatives with the plan and by encouraging former representatives to flip territories. (*Id.* ¶¶ 21–22.)

---

not adequately plead that the counter-defendant caused the breach. There, the only allegation of causation was a statement that "as a result of [Plaintiff's] efforts to recruit Defendants' agents, Defendants were forced to sell their [business] at a deep discount." *Id.* (brackets omitted). *Prudential* is distinguishable because the solicitation attempts did not succeed. *Id.* Here, Balfour alleges damages by asserting that virtually all of the restricted clients served by these 21 sales representatives transferred their business within five months. (Am. Compl. ¶¶ 2, 86.)

[8] As discussed below, Balfour makes additional factual allegations about the remaining six representatives.

Balfour then buttresses these more general allegations with factual details about breaches of certain sales representatives:

1. *Baker and Schroeder*

Balfour alleges that sales representatives Baker and Schroeder breached their employment agreements when they posted a Facebook video calling themselves the "Official Kansas yearbook ladies." (Am. Compl. ¶ 70.) In the video, Baker and Schroeder say they are ready "to hit the road again . . . with one small difference"—they're with Jostens. (*Id.*) The end of the video states, "Need help with your yearbook program? Contact via FB @yearbookyou." (*Id.*) Balfour alleges that the video was accessible to Balfour's clients, including "Restricted Clients previously serviced by Baker and Schroeder." (*Id.*)

The Representative Agreement states that each representative "will not, for herself or on behalf of or in conjunction with any other person or entity, directly or indirectly, sell products, solicit sales of products or assist others to sell or solicit sales of products of the kind or character or similar to [Balfour] products in the Territory." (*Id.* ¶ 18.) Posting a public video like this is solicitation if the "purpose was to entice members of [her] network to call her for the purpose of making sales in her new position." *Mobile Mini, Inc v. Vevea*, No. 17-CV-1684 (JRT/KMM), 2017 WL 3172712, at *6 (D. Minn. 2017). This video was apparently intended to market Baker and Schroeder's business in Kansas and was

available to former clients.[9] Thus Balfour has pled specific facts to show that Baker and Schroeder breached the employment agreement.

2.    *Hawkinson*

Balfour also alleged an example of Hawkinson's participation in Jostens's "plan." Hawkinson's Representative Agreement required that for two years after leaving Balfour, Hawkinson would not "directly or indirectly, sell products, solicit sales of products or assist others to sell or solicit sales of products of the kind or character of or similar to [Balfour] Products in the Territory." (Am. Comp. ¶ 14.) Balfour alleges that Hawkinson breached this agreement when a Jostens employee emailed one of Hawkinson's former clients to solicit business, stating,

> Jim Hawkinson is no longer with Balfour and has made the move to Jostens. He is currently at the start of his 2-year noncompete. . . . I am heading the yearbook operations with transitioning his schools to Jostens, so when Jim returns you will all be trained and ready to go. The goal is to get every school transitioned over so it will be a seamless transition when Jim resumes his role as your rep.

---

[9] Jostens cites several cases in support of its motion to dismiss. Two are inapposite because they consider motions for a preliminary injunction. *See Mid-Am. Bus. Sys. v. Sanderson*, No. 17-CV-3876 (JRT/DTS), 2017 WL 4480107, at *5 (D. Minn. Oct. 6, 2017) (denying motion for preliminary injunction because allegations were too speculative); *Invidia, LLC v. DiFonzo*, No. MICV20123798H, 2012 WL 5576406, at *6 (Mass. Super. Ct. Oct. 22, 2012) (denying preliminary injunction when the new employer posted a video announcing that they hired a new employee, and that employee was subject to a non-solicitation clause). The third case cited by Jostens is an order based on a bench trial. *See Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-284, 2016 WL 4523104, at *1 (N.D. Ohio Aug. 30, 2016). At this stage the Court must make all reasonable inferences in favor of Balfour, and it is reasonable to infer that a video accessible to former clients on social media was viewed by former clients.

(*Id.* ¶¶ 16, 17.) Although an email sent by someone else cannot be evidence that Hawkinson breached his Representative Agreement, it does tend to show that Jostens knew that Balfour representatives had noncompete clauses and that Jostens intended to have former Balfour representatives continue to work with the same clients. Thus, this example enhances Balfour's allegations of knowledge and motive.

While the Complaint does not cite examples for every representative, its allegations pass *Iqbal/Twombly* muster. Whether they can surpass summary judgment is another matter entirely and left for another day. The Court denies Jostens's motion to dismiss the tortious interference claim.

### B.      *Count III: Minnesota Deceptive Trade Practices Act*

Balfour alleges that Jostens violated the Minnesota Deceptive Trade Practices Act ("MDTPA") by spreading false rumors that Balfour's business was struggling. The parties dispute the pleading standard. Rule 9(b) of the Federal Rules of Civil Procedure requires that a party plead fraud or mistake with particularity, though "[m]alice, intent knowledge and other conditions of a person's mind may be alleged generally." Thus, claims of fraud under the MDTPA must be pled with specificity as required by Rule 9(b)—they must allege "the who, what, when, where and how" of the alleged fraud.

*Superior Edge, Inc v. Monsanto Co.*, No. 12–CV-2672 (JRT/FLN), 2013 WL 6405362, at *3 (D.

Minn. Dec. 6, 2013) (citing *E-Shops Corp.*, 678 F.3d at 665–66).

Balfour argues that this heightened pleading standard does not apply because it

alleges "defamation" under the MDTPA, not fraud.[10] In support, Balfour cites *Finlay v.

MyLife.com Inc.*, which concerned common-law defamation under Minnesota law. 525 F.

Supp. 3d 969 (D. Minn. 2021). As *Finlay* explains, "Minnesota law requires that a claim

for defamation must be pled with a certain degree of specificity. . . . At a minimum, the

plaintiff must allege *who* made the allegedly libelous statements, *to whom* they were made,

and *where*." *Id.* at 982 (quotation marks and citations omitted, emphasis added). In

addition, "Minnesota law generally requires that in defamation suits, the precise words

complained of be set forth 'verbatim.'" *Id.* (citations omitted). Thus, though Rule 9(b)'s

heightened pleading standard would not apply to a common-law defamation claim,

similar specificity is required under state law. *See also Cedar Rapids Lodge & Suites, LLC v.

JFS Dev., Inc.*, No. 09-CV-00175-LRR, 2010 WL 2836949, at *4 (N.D. Iowa July 19, 2010)

(explaining that in federal court, state-law defamation claims require specificity in

pleading, though they are subject to the pleading standard of Rule 8(a)).

---

[10] The word "defamation" appears nowhere in the MDTPA. *See generally* Minn. Stat.
§ 325D.44. The closest unfair trade practice as defined by the act seems to be
"disparag[ing] the goods, services, or business of another by false or misleading
representation of fact." *Id.* § 325D.44(8). Given the phrase "false or misleading
representation of fact," it seems Rule 9(b)'s heightened pleading standard for claims
rooted in fraud would still apply to this MDTPA claim. But the Court need not decide the
issue because the claim must be dismissed even under the standard advanced by Balfour.

Balfour's conclusory allegation that Jostens defamed it by spreading false rumors to Balfour's former clients that Balfour was going out of business does not even meet the notice-pleading standard of Rule 8(a). (Am. Compl. ¶¶ 82, 132.) It amounts to no more than a conclusory statement of law: that Jostens said something untrue, and it affected Balfour's business. Balfour did not identify any particular client, instance, or statement to give Jostens notice of the conduct at issue. Since Balfour did not even satisfy the less stringent pleading standard of Rule 8, it also did not satisfy the requirements of Rule 9(b) or pleading common-law defamation. The MDTPA claim is dismissed.

### C.   *Count IV: Trade Secret Misappropriation*

Balfour also asserts a trade secret misappropriation claim for business information under the Minnesota Uniform Trade Secrets Act ("MUTSA"). "Trade secrets laws are meant to be a shield to preserve the trust in confidential relationships, 'not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience.'" *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 867 (D. Minn. 2015) (quoting *E.W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1112–13 (8th Cir. 1969)). The Court considers whether Balfour has sufficiently alleged (1) trade secrets and (2) that its trade secrets were misappropriated.

#### 1.   *Balfour's Alleged Trade Secrets*

A "trade secret" is defined in MUTSA as "information" that "(1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject

of reasonable efforts under the circumstances to protect its secrecy." *See Ch Bus Sales, Inc. v. Geiger*, No. 18-CV-2444 (SRN/KMM), 2019 WL 1282110, at *8 (D. Minn. Mar. 20, 2019) (citing Minn. Stat. § 325C.01, subdiv. 5) (other citations omitted). A plaintiff need not allege the nature of the trade secrets with specificity at the pleading stage, but must describe them with more than conclusory statements and with "sufficient information to infer more than a mere possibility of misconduct." *Id.* (citations omitted). "Customer lists, pricing information, long-term sales strategies, and customer buying habits do not necessarily constitute trade secrets." *Katch*, 143 F. Supp. 3d at 868 (citation omitted).

Balfour has alleged that it has trade secrets constituting "pricing information, account contact lists, customer information, product information, product lists, supplies bulletins, sales, plans, financial information, and commission matrices," sales and marketing techniques and strategies, and compensation and bonus structures. (Am. Compl. ¶¶ 138, 142.) These things can be trade secrets if efforts are made to protect secrecy. *See Syngenta Seeds, LLC v. Warner*, No. 20-CV-1428 (ECT/BRT), 2021 WL 679289, at *12 (D. Minn. Feb. 22, 2021) (citing cases for the proposition that generalized allegations about types of data are sufficient at the pleadings stage).

Balfour alleges that it takes reasonable efforts to maintain the secrecy of this information. (Am. Compl. ¶ 140.) It "maintain[s] strict security over . . . confidential business information," and "do[es] not share it with anyone other than employees, representatives, and clients." (*Id.* ¶ 140.) Trade secrets are only shared with personnel

"who have a business need." (*Id.* ¶¶ 140, 143.) And Balfour requires "representatives to enter into Representative Agreements containing non-disclosure provisions." (*Id.* ¶ 140.) Balfour also alleges that there is an economic value from this secret information, specifically, to target likely customers. (*Id.* ¶ 139.) Under Balfour's theory of the case, the exodus of its clients—and the related loss in sales after its sales representatives transitioned to Jostens—is evidence of the economic value of its trade secrets.

Jostens asks the Court to consider information beyond the complaint: that some of this information is publicly available on Balfour's website. The Court will not do so, because this information advances a fact-based argument best reserved for summary judgment or trial. *See AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 971 (8th Cir. 2011) (determining whether a trade secret exists is a "fact-intensive inquiry" but "ultimately a question of law determined by the court"). Thus, the Court finds that Balfour has adequately alleged the existence of trade secrets.

2.    *The Alleged Misappropriation*

"Misappropriation," is the "acquisition," "disclosure," or "use[]" of another's trade secrets by improper means. Minn. Stat. § 325C.01, subdiv. 3. Improper means are "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* subdiv. 2. Recent cases in this district have allowed a misappropriation claim past the motion-to-dismiss stage in similar circumstances. For example, in *Stratasys, Inc. v. Krampitz*, a defendant allegedly

20

sent confidential emails to his own email account and used that information to start a new company. No. 17-CV-5524 (DSD/HB), 2018 WL 2247265, at *3–4 (D. Minn. May 16, 2018). And in *Deluxe Financial Services v. Shaw*, the defendant allegedly forwarded emails with customer information to his personal account and retained files with confidential files on a personal USB drive. No. 16-CV-3065 (JRT/HB), 2017 WL 3327570, at *2 (D. Minn. Aug. 3, 2017). Balfour alleges that Parker, a former executive, sent trade secret information to his personal email address and later shared that information with Jostens. And Balfour asserts that Jostens asked Balfour's former sales representatives to share trade secrets with Jostens in violation of restrictive covenants and as part of a concerted plan. Thus, Balfour has alleged a trade secret claim with sufficient factual specificity to survive the motion to dismiss.

### D.    *Punitive Damages*

Finally, Jostens moves to dismiss Balfour's punitive damages request, arguing that it is untimely under state law. Minnesota Statute Section 549.191 prohibits plaintiffs from seeking punitive damages in their complaint. Instead, "a party may make a motion to amend the pleadings to claim punitive damages." Minn. Stat. § 549.191. Thus, under state law, it would be improper for Balfour to seek punitive damages in its initial complaint.

The federal rules are different. Under the Federal Rules of Civil Procedure, a plaintiff may include its request for punitive damages in its complaint. *See* Fed. R. Civ. P. 8(a) (providing that a complaint "must contain" both "a short and plain statement of the

claim showing that the pleader is entitled to relief" and "a demand for the relief sought");

*Selective Ins. Co. of S.C. v. Sela*, 353 F. Supp. 3d 847, 857 (D. Minn. 2018) (finding that Rule

8 "authorizes a plaintiff to request any and all of the relief sought in all pleadings that

state a claim (including initial complaints)") (quotation marks and citation omitted).

Thus, state law and the federal rules conflict. *See id.*, 353 F. Supp. 3d at 857 (finding that

state law and Rule 8 had different requirements for what must be included in the original

complaint, and thus were in conflict); *Ramirez v. AMPS Staffing, Inc.*, No. 17-CV-5107

(DWF/BRT), 2018 WL 1990031, at *3 n.4 (D. Minn. April 27, 2018) (noting that a conflict

may exist between Minn. Stat. § 549.191 and Rule 8(a)).

This Court has analyzed the conflict between Section 549.191 and the Rule 15 of

the Federal Rules of Civil Procedure. *Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*,

No. 20-CV-609 (NEB/LIB), 2021 WL 7286933, at *3 (D. Minn. Aug. 6, 2021). Applying the

*Shady Grove* test, this Court found that Rule 15 and Section 549.191 are procedural and do

not alter substantive rights, and that application of Rule 15 does not contravene the Rules

Enabling Act. *Id.* (citing *Shady Grove Ortho. Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393

(2010)). The Court thus applied Rule 15 to a motion to amend a complaint to add punitive

damages. *Id.*

There is no reason to depart from that analysis here. Like Rule 15, Rule 8 is

procedural, does not alter substantive rights, and does not contravene the Rules Enabling

Act nor the Constitution. Rule 8(a) applies to pleading punitive damages under state law

in federal court, and thus Balfour properly sought punitive damages in its complaint. The request for punitive damages remains.[11]

## III.   Jostens's Counterclaims

Jostens asserts nine counterclaims against Balfour that fall into three categories. First, it seeks a declaration that its sales and recruiting program is lawful. Second, Jostens raises claims seeking relief for alleged misrepresentations by Balfour about where its rings are made. Third, Jostens asserts claims alleging that Balfour improperly bid on a Clemson University contract. As discussed below, the Court dismisses the declaratory judgment claim and the misrepresentation claims, but the claims alleging improper bidding related to the Clemson contract remain.

### A.   *Count I: Declaratory Judgment*

Declaratory "judgments must resolve a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quotation marks and citation omitted).

Declaratory relief is discretionary "and an important factor in exercising that discretion is whether the declaratory judgment plaintiff has another, more appropriate

---

[11] Jostens does not argue that Balfour failed to state a claim for punitive damages, so the Court does not consider whether the complaint adequately alleges deliberate disregard. *See* Minn. Stat. § 549.20(a) ("Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.").

remedy." *Gulf Underwriters Ins. Co. v. Burris*, 674 F.3d 999, 1004 (8th Cir. 2012) (citations omitted). Thus "[a] redundant declaratory judgment claim . . . should be dismissed." *Mille Lacs Band of Chippewa Indians v. Minnesota*, 152 F.R.D. 580, 582 (D. Minn. 1993) (citing *Aldens, Inc. v. Packel*, 524 F.2d 38, 51–52 (3d Cir. 1975)). But a declaratory judgment claim is not redundant just because it is closely related. *See* Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."). The inquiry is whether resolving one claim "would resolve all questions raised" by the other. *Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn., LLC*, 871 F. Supp. 2d 843, 862 (D. Minn. 2012) (quotation marks and citation omitted).

It would be improper to grant Jostens a declaratory judgment for future recruiting practices. Because the contract terms and Jostens's use of recruiting mechanisms are unknown, any analysis by the Court would be highly speculative. And many declarations that Jostens requests are merely statements of law. For example, Jostens seeks a declaration that "there is no artificial limit as to the number of independent sales representatives Jostens may choose to recruit or retain. . . . " (Countercl. ¶ 105(b).) Thus, when Jostens seeks a declaratory judgment that would apply beyond its recruitment of the 21 sales representatives underlying this case, Jostens seeks a declaration advising how the law applies to a hypothetical set of facts, which this Court cannot issue. *Est. of Stoick ex rel. Spry v. McCorvey*, No. CIV. 10-1030 DSD/AJB, 2011 WL 3419939, at *3 (D. Minn. July 29, 2011).

24

As it relates to the 21 sales representatives, the claim is redundant. Jostens does not point to any way its recruiting might be unlawful aside from tortious interference with contract. Thus, the declaratory judgment claim requires the same analysis as Balfour's tortious interference claim.

Because Jostens's declaratory judgment claim seeks relief that this Court cannot grant and is redundant, the claim is dismissed.

**B.      *Counts II–VI, IX: Misrepresentations About Class Ring Country of Origin***

Jostens raises several claims based on allegedly confusing country-of-origin label on Balfour's class rings: (1) a Lanham Act false advertising claim; (2) a Lanham Act false designation claim; (3) a claim for unlawful business practice under California's Unfair Competition Law ("UCL"); (4) a claim for false advertising under California law; (5) a MDTPA claim for false and misleading statements; and (6) a common-law unfair-competition claim.

*False advertising.* Advertisements violate the Lanham Act when they are "literally false as a factual matter" or "claims that may be literally true or ambiguous but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175 (8th Cir. 1998). "A literally false statement can be determined as a matter of law, but whether a statement is misleading is considered a matter of fact." *Allsup, Inc. v. Advantage 2000 Consultants Inc.*, 428 F.3d 1135, 1138 (8th Cir. 2005). To state a deceptive advertising claim under the

Lanham Act, Jostens must allege: (1) that Balfour "made false statements of fact about its own product"; (2) the statement "actually deceived or had the tendency to deceive a substantial segment of its audience"; (3) the deception was material; (4) Balfour caused a false statement to enter interstate commerce; and (5) Jostens "has been or is likely to be injured" because of the false statement. *Id.* (quotation marks and citation omitted).

Jostens does not allege any false statement. It asserts that Balfour's country-of-origin label states that the rings are "Designed and Engineered in Austin, Texas" and "Exclusively Manufactured by Balfour in Merida, Mexico." (Countercl. ¶ 74.) It then alleges that "engineered" means "designed and built" or "construct[ed]," based on selective and incomplete dictionary definitions. (*Id.* ¶ 82.) Thus, it asserts, the rings are not *engineered* in Texas because they are manufactured in Mexico. But the fact that the term "engineered" has varying definitions does not matter, because it would be unreasonable for a consumer to adopt the definition pled by Jostens. *See Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1230 (9th Cir. 2019) (upholding order granting motion to dismiss after finding it unreasonable for a consumer to ascribe the pled definition to a term). This Court must view the label in its full context, and in context there is no "tendency to mislead or deceive the consumer" based on this label—the label

unambiguously states that the rings were manufactured in Mexico.[12] *United Indus.*, 140 F.3d at 1182. Count II as to the class rings is dismissed.

*False designation and unfair competition.* The Lanham Act also prohibits using any "word, term, name, symbol, or device" or "any false designation of origin" which "is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods." 15 U.S.C. § 1125(a)(1)(A). To state an unfair competition claim under this section, Jostens must allege that the materials used "created a likelihood of confusion, deception or mistake on the part of the consuming public," and that Balfour "falsely

---

[12] Thus, this case is distinguishable from the cases cited by Jostens in its briefing. As Jostens argues, the inquiry into whether a label is misleading is a "question of fact." *Wing Enterprises, Inc. v. Tricam Indus., Inc.*, 511 F. Supp. 3d 957, 968 (D. Minn. 2021). But here the Court finds that Jostens has not plausibly pled that the labels are misleading and dismisses the claim. *See id.* (denying motion to dismiss after concluding that a reasonable jury could find the claims misleading); *see also Shalikar v. Asahi Beer U.S.A., Inc.*, No. LACV-1702713 JAK(JPRx), 2017 WL 9362139, at \*7–8 (C.D. Cal. Oct. 16, 2017) (considering allegations about specific features of packaging including the use of Japanese script and phrases in finding that a consumer could infer that the product was produced in Japan, thus the plaintiff plausibly alleged a claim); *de Dios Rodriguez v. Ole Mexican Foods Inc.*, No. EDCV 20-2324-JGB-(SPx), 2021 WL 1731604, at \*4–5 (C.D. Cal. Apr. 22, 2021) (finding that consumers might be confused by packaging with phrases including "A Taste of Mexico" and "Authentic" and Spanish language on the front, even though the back of the label stated, "Made in the U.S.A." because "a reasonable consumer is not expected to look beyond misleading representations on the front of the box. . . .") (quotation marks and citation omitted); *Marty v. Anheuser-Busch Cos., LLC*, 43 F. Supp. 3d 1333, 1340–42 (S.D. Fla. 2014) (denying motion to dismiss claim when beer label stated that it "Originated in Germany" and was "Brewed Under the German Purity Law of 1516" but also said "Product of USA" in lettering that was small, difficult to read, and not viewable by a consumer in the store, because the label was not legible and because a reasonable consumer might not see the "Product of USA" label when deciding whether to purchase the beer).

designate[d] the origin of a product." *MyPillow, Inc. v. LMP Worldwide, Inc.*, 331 F. Supp. 3d 920, 933 (D. Minn. 2018). As discussed, Jostens does not plausibly allege that Balfour falsely designated the origin of the class rings.[13] Count III is dismissed.

 *State law claims.* Along with the Lanham Act claims, Jostens asserts several state law claims: California statutory and common-law unfair-competition claims and a claim under the MDTPA. Though they are distinct claims, the analysis is the same as the Lanham Act. *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) (applying Lanham Act standard to California statutory and common-law unfair-competition claims because they are "substantially congruent"); *Coyne's & Co. v. Enesco, LLC*, 565 F. Supp. 2d 1027, 1044 (D. Minn. 2008) (analyzing Minnesota deceptive trade practices claims "under the same rubric as claims under the federal Lanham Act"). The California statutory claims, the MDTPA claim, and the unfair competition claim about class rings are dismissed.

## C. *Counts II & VII–IX: Clemson University Class Ring Contract*

 Jostens raises several counterclaims related to Balfour's allegedly fraudulent bid for the Clemson University class ring contract: (1) a Lanham Act false advertising claim;

---

[13] Jostens also alleges that Balfour suppresses country-of-origin designations on its website and that it misrepresented that its rings were made in the United States when it bid on the Clemson contract. (Countercl. ¶¶ 89–96.) Jostens does not allege that these statements are false nor does it allege that consumers are confused by these statements or explain how these statements are confusing. It suggests that this may be a violation of U.S. trade law but does not explain how that affects a Lanham Act analysis. Thus, the Court will also dismiss these claims because Jostens has not stated a claim under the Lanham Act.

(2) a South Carolina Unfair Trade Practices Act ("SCUTPA") claim; (3) a common-law tort claim for intentional interference with contract; and (4) a common-law unfair-competition claim.

Before turning to the substance of these claims, the Court addresses whether Balfour is a proper counter-defendant. According to Balfour, *Palmetto* Balfour was the party that submitted the bid to Clemson, and thus this claim should be dismissed. A party may move to dismiss a complaint for failure to join a party. Fed. R. Civ. P. 12(b)(7). Dismissal under this rule is "warranted only when the defect is serious and cannot be cured." *Omega Demolition Corp. v. Hays Grp., Inc.*, 306 F.R.D. 225, 227 (D. Minn. 2018) (citation omitted). The party seeking dismissal has the burden of "producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Id.* (citation omitted). A party is required if "the court cannot accord complete relief among existing parties" without it or if there are competing interests in the subject matter of the litigation. Fed. R. Civ. P. 19(a)(1)(A).

Balfour asserts that Palmetto Balfour is necessary because it is a separate company, (ECF No. 92-2), and it won the bid from Clemson University. (ECF No. 92-1.) But Jostens's claims do not stem from the contract, they stem from the bidding process. Jostens has pled facts and submitted evidence[14] to suggest that Balfour was responsible for some of

---

[14] Courts reviewing a motion to dismiss under Rule 12(b)(7) and Rule 19 must still accept the allegations in the complaint (or counterclaim) as true and may consider evidence beyond the pleadings. *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1300 (D. Minn. 2018).

the allegedly tortious conduct in bidding. (*See e.g.*, ECF No. 101-2 (identifying Balfour as the bidder); Countercl. ¶¶ 54–56 (same).) Balfour has identified no interest of Palmetto Balfour to be impaired by consideration of these claims—the contract is not in doubt, and these are claims for damages. Thus, the Court will consider any fact issues about the extent of Balfour's involvement in the bidding process and whether any tortious conduct is attributable to Balfour on a motion for summary judgment.

Because Balfour did not meet its burden to produce evidence showing that Palmetto Balfour's interests would be impaired, the Court will not dismiss the claim for failure to join a necessary party.

### 1.    Pleading Standard

Rule 9(b) governs these claims because they allege fraud. Thus, as discussed above, the complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations pleaded on information and belief" seldom meet this standard. *Ambassador Press, Inc. v. Durst Image Tech. U.S., LLC,* 949 F.3d 417, 421 (8th Cir. 2020). But allegations may be made on information and belief "[w]hen the facts constituting the fraud are peculiarly within the opposing party's knowledge." *Id.*

Balfour asks the Court to disregard allegations of fraud made "on information and belief." As it relates to the Clemson contract, there are two allegations made "on information and belief": (1) that customers of Balfour's have already been deceived by representations about its pricing scheme, (Countercl. ¶¶ 116, 182); and (2) that Balfour

never intended to use the "firm, fixed pricing" scheme in its bid. (*Id.* ¶ 118.) The Court will consider both allegations. The first is supported by sufficient factual allegations about Clemson's decision to have a second bidding process. The second is an allegation about motive and not within Jostens's knowledge. Accordingly, as discussed below, the Court finds that Jostens has stated claims for relief relating to the Clemson contract.

    2.    *Count II: Lanham Act False Advertising Claim*

Jostens alleges that Balfour falsely advertised that it would use "firm, fixed pricing" for its class rings when it submitted a bid to Clemson. (Countercl. ¶¶ 114–118.) Balfour moves to dismiss this claim, arguing the statements are not advertisements because they were submitted only in a bid to Clemson and thus were not widely distributed.[15]

A claim for false advertising under the Lanham Act must concern "commercial advertising or promotion"; the allegedly false statements must be "disseminated sufficiently to the relevant purchasing public . . . within that industry*." Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999) (citing *Seven–Up Co. v. Coca–Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996)). "The level of circulation required to constitute advertising and promotion will vary from industry to industry and from case to case." *Willis Elec. Co. v. Polygroup Macau Ltd. (BVI)*, 437 F. Supp. 3d 693, 712 (D. Minn. 2020) (citation omitted).

---

[15] Balfour does not argue that Jostens failed to state the other elements of a false advertising claims.

Jostens alleges sufficient facts to show that Balfour's bid was an advertisement in the school products industry. According to the Complaint, there are only three major companies in this industry. (Am. Compl. ¶ 55.) They compete by submitting bids to schools to become the exclusive provider for that school. (Countercl. ¶¶ 52–62.) Marketing is generally limited to communications between sales representatives and decisionmakers and bidding processes. (Am. Compl. ¶¶ 34–46; *cf.* Countercl. ¶ 55.) At the pleading stage, this states a claim that bids are distributed sufficiently within the industry to constitute advertisements under the Lanham Act. *See Tao of Sys. Integration, Inc. v. Analytical Servs. & Mats., Inc.*, 299 F. Supp. 2d 565, 569 & 574 (E.D. Va. 2004) (finding that a bid proposal to NASA was sufficiently disseminated to state a Lanham Act false advertising claim).[16] Because Jostens sufficiently alleged an advertisement, Balfour's motion to dismiss the Lanham Act false advertising claim relating to the Clemson bid is denied.

3.     *Count VII: SCUTPA*

Jostens also asserts that Balfour's bid to Clemson was unfair or deceptive under SCUTPA. To prevail on its SCUTPA claim, Jostens must show: (1) that Balfour" engaged in an unfair or deceptive act in the conduct of trade or commerce"; (2) that "the unfair or

---

[16] Balfour objects to the use of out-of-circuit precedent that does not require dissemination. *Tao* states the same standard as applied in the Eighth Circuit, and the Court considers it only as helpful guidance. *See Tao*, 299 F. Supp. 2d at 572 (stating the rule that an advertisement must be "disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry").

deceptive act affected public interest"; and (3) that Jostens "suffered monetary or property loss as a result of [Balfour's] unfair or deceptive act(s)." *In re Hughes*, 627 B.R. 327, 337 (Bankr. D.S.C. 2021) (citing S.C. Code Ann. §§ 39-5-10 et seq.). "An unfair or deceptive trade practice has an impact upon the public interest if it has the potential for repetition." *Haley Nursery Co. v. Forrest*, 381 S.E.2d 906, 908 (S.C. 1989) (citation omitted). The second and third elements are at issue: causation and pattern capable of repetition.

*Causation.* Jostens has sufficiently alleged harm caused by Balfour's misrepresentations in its pitch to Clemson. It alleges that the industry is small, with only a few companies participating in any bid process. Jostens alleges that it submitted a bid to Clemson and that ring pricing was so important to Clemson that it revoked its initial decision to award Balfour the contract in part because it did not meet Clemson's ring pricing requirements. (Countercl. ¶¶ 54–55.) And Jostens alleges that it was damaged by Balfour's fraudulent bid. (*Id.* ¶ 169.) Considering the allegations in the light most favorable to Jostens and making all reasonable inferences in Jostens's favor, Jostens has alleged that Balfour's fraudulent bid caused Jostens to lose the Clemson contract. *See In re MI Windows & Doors, Inc. Prods. Liab. Litig.*, No. 2:11–CV–00167–DCN, 2012 WL 5408563, *6 (D.S.C. Nov. 6, 2012) (denying motion to dismiss SCUTPA claim with similar factual allegations).

*Pattern capable of repetition.* Under SCUTPA, potential for repetition can be shown in two ways: (1) "by showing the same kind of actions occurred in the past, thus making

it likely they will continue to occur absent deterrence," or (2) "by showing the company's procedures create a potential for repetition of the unfair and deceptive acts." *Crary v. Djebelli*, 496 S.E.2d 21, 23 (S.C. 1998). Jostens asserts this pattern because it alleges that Balfour fraudulently bid for the Clemson contract twice and that Jostens regularly competes with Balfour for business.

    4.    *Count VIII: Intentional-Interference Claim*

       Jostens also raises a common-law intentional-interference claim for Balfour's bid to Clemson. In South Carolina, intentional interference with prospective contract relations requires "(1) intentional interference with a plaintiff's potential contractual relations, (2) for an improper purpose or by improper methods, and (3) causing injury to the plaintiff." *A Fisherman's Best, Inc. v. Rec. Fishing All.*, 310 F.3d 183, 195 (4th Cir. 2002). Jostens must plead facts to show it had a prospective contract with Clemson and "some reasonable expectation of benefits from the alleged lost contracts." *United Ed. Distribs., LLC v. Ed. Testing Serv.*, 564 S.E.2d 324, 329 (S.C. Ct. App. 2002).

       Making all reasonable inferences and considering the allegations in the light most favorable to Jostens, Jostens has alleged that it was "unsuccessful in acquiring an expected contract due to [Balfour's] intentional and wrongful" misrepresentation in its bid. *Id.* at 328. As discussed above, Jostens has alleged that only three companies bid in the process and that Clemson withdrew its initial decision to grant the bid to Balfour. Thus, Jostens has alleged facts suggesting that, had Balfour not misrepresented its ring

prices, Jostens could have won the Clemson contract. Jostens has also alleged that Balfour had an improper purpose: to deceive Clemson. (Countercl. ¶¶ 64, 182.) Thus, Balfour's motion to dismiss the intentional-interference claim is denied.

5.      *Count IX: Common-Law Unfair-Competition Claim*

As for Jostens's common-law unfair-competition claim related to class rings, the parties dispute whether Minnesota or South Carolina law applies. According to Balfour, this claim must be dismissed under Minnesota law because it duplicates the other claims. According to Jostens, South Carolina law permits duplicative common-law unfair-competition claims.[17] The parties did not brief the choice-of-law analysis, and it is unclear to the Court if the record is sufficiently developed to address the choice-of-law issue. Because additional factual development is likely necessary to rule on the choice-of-law issue and any resulting dismissal, the Court declines to dismiss this claim at this stage.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Jostens's motion to dismiss (ECF No. 65) is GRANTED IN PART and DENIED IN PART as follows:

---

[17] Jostens also argues that this claim is not duplicative, but this claim apparently duplicates the previous claim for intentional interference with prospective contract relations because the only contract allegedly interfered with was the Clemson contract. Thus, under Minnesota law it seems that the unfair competition claim would be dismissed.

    a.      The motion is DENIED as to Counts I and IV and the request for punitive damages;

    b.      The motion is GRANTED as to Count III; and

2.    Balfour's motion to dismiss the counterclaims (ECF No. 89) is GRANTED IN PART and DENIED IN PART as follows:

    a.      The motion is GRANTED as to Count I;

    b.      The motion is GRANTED as to Count II's country-of-origin allegations;

    c.      The motion is DENIED as to Count II's Clemon bid allegations;

    d.      The motion is GRANTED as to Counts III, IV, V, and VI;

    e.      The motion is DENIED as to Counts VII and VIII;

    f.      The motion is GRANTED as to Count IX's country-of-origin allegations;

    g.      The motion is DENIED as to Count IX's Clemson bid allegations.


Dated: August 18, 2022                BY THE COURT:

                                        s/Nancy E. Brasel
                                        Nancy E. Brasel
                                        United States District Judge